**Marcela HAMBLIN, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 2:02–CV–4.

United States District Court,
D. Vermont.

Jan. 29, 2004.

Devin McLaughlin, Esq., Middlebury, VT, for Plaintiff.

Michael P. Drescher, Esq., Burlington, VT, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, Chief Judge.

Plaintiff Marcela Hamblin of Middlebury, Vermont has sued the United States under the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680 (West 1994 & Supp.2003). The suit arises out of an accident which took place between Hamblin and Sergeant Dennis Armell on July 9, 1999 in Vergennes, Vermont. Hamblin asserts that Armell was negligent and that the United States is liable for Armell's negligence because Armell was an employee of the United States, acting within the scope of his employment when the accident occurred. Hamblin claims that as a direct and proximate result of the accident, she has experienced continuing physical injury to her back and lower extremities leading to loss of wages and physical and mental suffering. She seeks compensatory damages for these injuries. The case was tried to the Court on October 9 and 10, 2003.

### I.  Findings of Fact

#### A.  Events of July 9, 1999

On the morning of July 9, 1999, Hamblin drove from her home in Middlebury to Vergennes to take her dog to be groomed at the Hair of the Dog pet-grooming salon. Hamblin was 59 years old at the time. She had driven vehicles since she was 21 years old.

At approximately 10:00 A.M., Hamblin pulled her 1995 Mercury Cougar into LeBeau & O'Brien's Mobil gas station at the corner of Route 22A and Water Street in Vergennes to ask for directions. The gas station has twin fuel pumps on an island located on the north side of the station and a single diesel pump located on the east side of the station. Hamblin parked her

car approximately three feet behind a car located at the rear pump of the island. She was parked so that her driver's side door was approximately five feet behind a military Humvee driven by Sergeant Dennis Armell of the Vermont Army National Guard.

Armell is the full-time supply sergeant for Battery B, First Battalion, 86th Field Artillery, based in Vergennes. He had driven the Humvee to the gas station that morning in order to fuel the vehicle so that it would be prepared for a trip the following day. Armell had parked the Humvee at the diesel pump. When he first parked the Humvee, there was no vehicle in front of it. Armell intended to depart from the gas station by moving forward, not reversing.

After he paid for the diesel fuel, Armell observed that a car had parked in front of the Humvee, blocking his forward path. Armell walked behind the Humvee to confirm that no objects blocked his path to the rear. He observed no vehicles to the rear of the Humvee. Armell walked to the front of the Humvee and entered the driver's side of the vehicle. He adjusted his seatbelt and arranged himself in the driver's seat. In addition, he turned on the ignition switch that illuminated the vehicle's "wait light." Armell waited approximately 8–12 seconds for the wait light to turn off.

While Armell was arranging himself in the vehicle and waiting for the wait light to turn off, the Humvee's exterior lights were not illuminated. When the wait light turned off, Armell turned on the Humvee's lights, including its tail lights, and started the vehicle. Approximately 30–45 seconds elapsed between when Armell walked behind the Humvee and when he started to reverse. During this time period, Hamblin parked her car behind the Humvee.

Before reversing the Humvee, Armell checked the side rearview mirrors on both the driver's side and passenger's side of the Humvee. He did not observe a vehicle parked behind the Humvee. That morning, Armell had adjusted the side rearview mirrors so that they would take in the rear-corners of the vehicle. The Humvee is 90 inches wide, at its widest, and it is not possible to observe the vehicle's rear bumpers from the side rearview mirrors. The Humvee has no center rearview mirror. Although there is a canvas window in the rear of the Humvee, it is not possible to see through it. As a result, the Humvee has a large blind spot.

Armell was aware of the safety concerns associated with the operation of a military vehicle, including the problems presented by a vehicle's blind spot. He was aware that the Humvee has a large blind spot. Armell had received training on the proper procedure for reversing a military vehicle during the 1970s. That training required using ground guides to reverse a military vehicle while on base. Armell was also familiar with the layout of the gas station, having used the station approximately one-hundred times. Armell was aware that if the twin fuel pumps were occupied, then the next car in line would be parked behind his vehicle.

In order to reverse the Humvee, Armell put the vehicle into gear and released pressure from the brake pedal. Armell did not use ground guides or seek another individual's assistance. While reversing the Humvee, Armell looked in his driver's side rearview mirror. He did not observe Hamblin's car, however. The Humvee traveled in reverse for 5 to 10 seconds before making contact with Hamblin's car.

When Hamblin first observed the reversing Humvee, her driver's side door was open and her left leg was on the ground. As the Humvee approached her car, she sounded her horn but was unable to move her leg out of the way. The

Humvee made contact with the driver's side door of Hamblin's car, pinching her lower left leg between the car door and frame of the car. When the Humvee made contact with Hamblin's car, her dog began to bark. Hamblin tried to calm the dog and sound the horn simultaneously. The Humvee made contact with Hamblin's car at least once.[1]

Hamblin's car was damaged. She paid $461.80 for repairs and $63 for a rental car, for a total equaling $524.80.

### B. Ms. Hamblin's Medical History Prior to July 9, 1999

Hamblin has a history of chronic lower back pain. In January of 1995, Hamblin was involved in a motor vehicle accident after which she suffered back pain. (Def's Ex. B.) On December 10, 1997, Hamblin reported to her physician that she had recently experienced a worsening of her lower back pain accompanied by "pain radiating from her left buttock into her medial thigh." (Def.'s Ex. C.) On January 14, 1999, Hamblin reported to her physician that she had experienced lower back pain for three days, after having scrubbed tubs and climbed stairs at work. In addition, Hamblin felt numbness in her left lateral foot. (Def.'s Ex. H.)

In her application for Social Security benefits, dated November 6, 2000, Hamblin reported having neck pain that "radiates into both extremities and sometimes causes numbness in my little finger." These symptoms are accompanied by "lots of grinding." Hamblin reported that she has never seen a doctor for this pain. (Def.'s Ex. Fl.)

Hamblin has a history of being overweight. In addition, since at least 1995, Hamblin has suffered from pain in her right knee. She was eventually diagnosed with "progressive degenerative arthritis." Her knee problem required surgery in 1995 and 1998. (Def.'s Ex. I.) Hamblin also has a history of hammertoes and bunions on her feet. In January 2001, she underwent surgery to alleviate the pain caused by her foot condition. (Def.'s Ex. Z.)

### C. Ms. Hamblin's Medical History Subsequent to July 9, 1999

After the accident, Hamblin experienced immediate swelling in her left calf accompanied by pain. She proceeded to bring her dog to the grooming appointment. Later, while Sergeant Armell watched her foster children, Hamblin visited Porter Hospital in Middlebury due to the pain in her leg.

In the Porter Hospital Emergency Room, Hamblin was diagnosed with a leg contusion. Mild soft tissue swelling and bruising was noted. X-rays revealed no fractures. Hamblin testified that the bruise on her left calf lasted for some time. She also has a knot and small indentation in her left calf which have persisted.

The parties have stipulated that Hamblin's medical expenses for her calf injury were $2,281.25. These expenses include the cost of her initial physical therapy.

Hamblin's work as an X-ray technologist regularly required her to lift heavy files while climbing step ladders. Her work also regularly required her to lift and move patients. Hamblin missed work on the Saturday and Sunday immediately fol-

---

1. The parties dispute how many times the Humvee made contact with Hamblin's car. Armell claims that he reversed the Humvee once, stopped the vehicle when he heard Hamblin's horn, then drove forward and exited the vehicle. Hamblin contends that Ar-mell reversed, made contact and pulled forward three separate times and was in the process of reversing the fourth time when he finally stopped and exited the Humvee. It is not necessary to resolve this dispute to answer the question of liability.

lowing the accident. At that time, her hourly wage was $14.75. Assuming she had worked eight hours per day, her lost wages for the two days were $236.

During the first full work week following the accident, Hamblin worked forty-seven hours. (Def.'s Ex. J1.) During the five months following July 9, 1999, Hamblin worked more than six-hundred hours. (Def.'s Ex. K1.) Hamblin continued her work as an X-ray technologist at Porter Hospital for more than a year following the accident. *Id.*

On July 16, 1999, one week following the accident, Hamblin complained of "bilateral hip" pain to her primary care physician, Dr. Scott Smith. Dr. Smith diagnosed the pain as musculoskeletal. Hamblin did not report that the hip pain was radicular.[2] (Def.'s Ex. K.) Dr. Smith referred Hamblin to physical therapy at Porter Physical Therapy.

The initial physical therapy note describes Hamblin as experiencing pain in both hips and the sacrum. (Pl.'s Ex. 28, Tab C.) According to Hamblin's Daily Flow Sheet from Physical Therapy, Hamblin reported that the pain in her hips and lower back was "100% better" as of August 10, 1999. *Id.* Despite this improvement, the Flow Sheet records that Hamblin experienced varying degrees of pain in her left leg, buttock, hip and lower back on various days during her physical therapy. *Id.*

Hamblin again visited Dr. Smith on July 30, 1999. Dr. Smith noted Hamblin's physical therapy and reports that "she has had much significant improvement in her bilateral hip discomfort." In addition, "she has some lower back discomfort which she feels is improving and some left calf discomfort which is also resolving." (Def.'s Ex. L.) On August 31, 1999, Hamblin had another appointment with Dr. Smith. Smith reported that the pains in Hamblin's left calf, lower back and hip "are gradually improving with physical therapy." (Def.'s Ex. M.) Hamblin missed her follow-up appointment on September 27, 1999. *Id.*

On December 7, 1999, Hamblin reported to Dr. Smith that she was experiencing "some numbness and tingling in her lower extremities which started about five days ago." Dr. Smith ordered an MRI. (Def.'s Ex. N.)

On December 20, 1999, Hamblin underwent an MRI of the lumbosacral spine. It was observed that "[d]egenerative change is present centered about the mid and lower lumbar discs with associated multi-level broad based disc bulge and multifactorial spinal canal narrowing at the L3–4 and L4–5 levels." (Def.'s Ex. O.)

In her follow-up appointment with Dr. Smith, on January 17, 2000, Hamblin complained of "intermittent discomfort in her hips or what she describes as the sacroiliac area." She also reported "persistent numbness and lateral aspect of her right foot and intermittent tingling in her left foot." Dr. Smith's assessment was "[s]pinal stenosis with multivariant factors."[3]

---

**2.** In relevant part, the Merriam Webster Medical Dictionary defines radicular as "of, relating to, or involving a nerve root." Available at: http://www.intelihealth.com/cgi-bin/dictionary.cgi.

**3.** The National Institute of Health describes spinal stenosis as follows:

Spinal stenosis is a narrowing of spaces in the spine (backbone) that results in pressure on the spinal cord and/or nerve roots.

This disorder usually involves the narrowing of one or more of three areas of the spine: (1) the canal in the center of the column of bones (vertebral or spinal column) through which the spinal cord and nerve roots run, (2) the canals at the base or roots of nerves branching out from the spinal cord, or (3) the openings between vertebrae (bones of the spine) through which nerves leave the spine and go to other parts of the body. The narrowing

(Def.'s Ex. P.) Dr. Smith referred Hamblin to a neurologist for further evaluation. Dr. Smith also referred Hamblin to the Spine Institute of New England. *Id.*

The neurologist who treated Hamblin is Dr. Andres Roomet. At trial, Roomet provided expert testimony on Hamblin's behalf. Hamblin had her first appointment with Dr. Roomet on February 2, 2000. Dr. Roomet diagnosed Hamblin's condition as "spinal stenosis syndrome with some mild radiculitis right greater than left." (Def.'s Ex. Q.)

On April 10, 2000, Hamblin suffered a slip-and-fall accident on an icy sidewalk which required a trip to the emergency room. According to the emergency room report, she suffered a contusion to the left knee and left palm. (Def.'s Ex. R.)

On April 19, 2000, Hamblin saw Dr. Grzyb, an orthopedist with the Spine Institute of New England. In this appointment, Hamblin reported to Dr. Grzyb that she has suffered from longstanding back pain. She also reported discomfort in her lower extremities, including numbness in her right foot. According to Hamblin, these symptoms "were worsened" after her accident on July 9, 1999. (Def.'s Ex. S.) Dr. Grzyb told Hamblin that in his opinion her symptoms were not severe enough to justify surgical intervention. They discussed the possibility of an "epidural injection." *Id.*

During her May 10, 2000 appointment with Dr. Smith, Hamblin discussed her decision to have an epidural injection. She also discussed how her chronic pain affects her job. (Def.'s Ex. T.)

In May of 2000, Hamblin was injected with an epidural block. In her June 21, 2000 appointment with Dr. Smith, Hamblin reported that the epidural block resolved her lower back pain, but that she continued to have lower extremity discomfort and cramping. (Def.'s Ex. U.) Hamblin discussed her difficulty working an eight-hour shift as a radiology technician due to her pain. Dr. Smith gave Hamblin a note limiting her to a four-hour work shift. *Id.*

Hamblin was also referred back to Porter Physical Therapy, which she began in August, 2000. As documented in her physical therapy records, she was experiencing "intermittent complaints of low back pain at left PSIS, lateral sacrum, and left hip." (Pl.'s Ex. 28, Tab C.) In her August 14, 2000 appointment with Dr. Smith, Hamblin explained that her pain was hindering her ability to work and attend physical therapy. It was agreed that Hamblin would discontinue work pending an upcoming appointment with Dr. Grzyb. (Def.'s Ex. V.) Hamblin has not worked since August, 2000 due to persistent pain.

In September, 2000, Hamblin underwent a CT-myelogram. For a few months following the procedure, the pain in her left hip, thigh, and outer leg subsided. In November, 2000, Hamblin applied for Social Security benefits. (Def.'s Ex. F1.)

In May, 2002, Hamblin had her second meeting with Dr. Roomet. She reported hip pain. Dr. Roomet concluded that an orthopedic evaluation was required. (Def.'s Ex. A1.) In August, 2002, Dr. Roomet met with Hamblin a third time after being retained by Hamblin's counsel as an expert witness. (Def.'s Ex. E1.)

### D. *Expert Testimony of Dr. Roomet*

Dr. Roomet is a board-certified neurologist who provided expert testimony on be-

---

may involve a small or large area of the spine. Pressure on the lower part of the spinal cord or on nerve roots branching out from that area may give rise to pain or numbness in the legs. Pressure on the up-per part of the spinal cord (that is, the neck area) may produce similar symptoms in the shoulders, or even the legs.
Available at: http://www.niams.nih.gov/hi/topics/spinalstenosis/spinal_ste.htm# spine_a.

half of Ms. Hamblin. Roomet also testified that the pain Hamblin developed in the left hip and sacroiliac region, the left buttock, posterior thigh and lateral calf was radicular in nature. He testified that, to a reasonable degree of medical probability, the symptom complex was the result of aggravation of Hamblin's pre-existing spinal stenosis. Roomet testified that, to a reasonable degree of medical probability, this aggravation was caused by the July 9, 1999 accident.

Roomet's understanding of the events of July 9, 1999 was derived from what Hamblin told him. Roomet understood that during the incident Hamblin twisted and wrenched herself in an effort to free her leg and calm her hysterical dog. Roomet opined that this action was a competent causal mechanism of Hamblin's worsened spinal stenosis.

Roomet primarily based his opinion on the chronological relationship between the accident and the onset of Hamblin's symptoms. According to Roomet, an individual with spinal stenosis can be asymptomatic or moderately symptomatic. Upon the occurrence of a "competent injury" the condition can worsen. Roomet testified that the change in Hamblin's symptom complex-the onset of hip and sacroiliac pain, which occurred within two weeks of the accident-supported his opinion on causation.

### E. Expert Testimony of Dr. Cohen

Dr. Cohen is a board-certified neurologist who provided expert testimony on behalf of the United States. Cohen reviewed Hamblin's medical history to determine whether her symptoms were causally related to the July 9, 1999 accident.

Dr. Cohen testified that in his opinion, the July 9, 1999 accident did not cause Hamblin's back pain and radicular symptoms. Dr. Cohen observed that Hamblin did not report radicular symptoms until five months after the accident. According to Dr. Cohen, radicular symptoms typically appear between two weeks and a month after an accident.

Dr. Cohen noted that on two occasions prior to the accident, December 10, 1997 and January 14, 1999, Hamblin reported experiencing radicular symptoms. Dr. Cohen also observed that Hamblin's Social Security application reports radicular symptoms in her neck.

Dr. Cohen pointed to "confounding factors," such as Hamblin's knee arthritis and foot deformities, which "probably altered gait patterns." Dr. Cohen also listed being overweight as a confounding factor. Dr. Cohen testified that lifting heavy objects, like Hamblin did as an X-ray technologist, could initiate or exacerbate back problems. Dr. Cohen testified that slip-and-fall accidents, like the one Hamblin had in April, 2000, often initiate or exacerbate back problems.

According to Dr. Cohen, spinal stenosis usually gets worse. Symptoms include back pain radiating into the legs, numbness in the feet and weakness in the lower extremities.

## II. Conclusions of Law

### A. Negligence

Hamblin brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680. Hamblin alleges that Sergeant Armell was negligent in backing into her vehicle. She further asserts that the United States is liable for Armell's negligence because Armell was an employee of the United States, acting within the scope of his employment when the accident occurred. The United States contends that it is not liable because of Hamblin's comparatively negligent conduct.

### 1. *Sergeant Armell's Conduct*

Under the Federal Tort Claims Act, the United States is liable for the negligence of its employees, acting within the scope of their employment, in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C.A. §§ 1346(b)(1), 2674 (West 1994 & Supp. 2003). It is undisputed that Armell was an employee of the United States acting within the scope of his employment when the accident occurred. Therefore, the United States is liable for his alleged negligence. Vermont law governs both liability and damages in this case. 28 U.S.C.A. § 1346(b)(1).

■ To establish negligence, Hamblin must prove by a preponderance of the evidence the following elements: (1) Armell owed Hamblin a duty of care; (2) Armell breached this duty; (3) Hamblin suffered injuries; (4) Armell's breach of duty proximately caused Hamblin's injuries. *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 76, 665 A.2d 39, 42 (1995).

■ Armell owed Hamblin a duty to exercise reasonable care. Reasonable care is that care which a reasonably prudent person would use in conducting his or her own affairs in light of the surrounding circumstances. *See, e.g., Garafano v. Neshobe Beach Club, Inc.*, 126 Vt. 566, 573, 238 A.2d 70, 76 (1967). As the operator of a vehicle, Armell owed Hamblin a duty to "maintain a reasonable and proper lookout for persons and property ... and to use reasonable diligence to avoid inflicting injuries on such persons or property." *Beaucage v. Russell*, 127 Vt. 58, 62, 238 A.2d 631, 634 (1968). The circumstances of each case dictate what is to be considered a "reasonable and proper lookout." *Id.*

■ Sergeant Armell breached his duty to exercise reasonable care while operating his vehicle, although his conduct makes the question particularly close. When he realized he needed to reverse the Humvee, Armell walked to the rear of the vehicle to ensure that nothing blocked his path. Before reversing, he checked both his side rearview mirrors. Armell had earlier adjusted these mirrors to their proper position. In addition, once Armell started the vehicle, he illuminated the exterior lights. There is no evidence that Armell reversed at anything but a reasonable rate of speed. He testified credibly that he continuously looked in his driver's side rearview mirror while reversing.

This is the conduct of a careful driver and officer. Nevertheless, the fact remains that Sergeant Armell reversed the Humvee without being able to see what was directly behind him. As a result, the Humvee made contact with Hamblin's vehicle at least once. Armell should have been aware that the 30–45 second interval between when he walked behind the Humvee and when he began to reverse was ample time for a car to park behind him. As a frequent customer, Sergeant Armell was familiar with the gas station's layout. He was cognizant that a vehicle in line at the pump would likely park behind the Humvee. Therefore, acting as a reasonably prudent person, Armell should have taken into account the possibility of a car pulling in behind him while he arranged himself in the driver's seat and waited for the wait light.

Such a possibility created a substantial risk of accident because of the Humvee's large blind spot. Armell was well aware of the Humvee's large blind spot and the safety problems associated with it. He had been trained in the use of ground guides while reversing military vehicles. The Court need not speculate as to whether ground guides were required in this situation. It is sufficient to state that Armell did not employ any technique to ensure

that the area which he could not see was free from obstruction while he reversed the vehicle. Given these circumstances, Armell failed to maintain a reasonable and proper lookout while reversing the Humvee.

### 2. *Comparative Negligence*

■ The United States alleges that Ms. Hamblin was comparatively negligent because she ignored an obvious danger when she parked behind the Humvee. Under a comparative negligence analysis, if the plaintiff's negligence is less, than that of the defendant, her award is reduced by a percentage equal to her negligence. Vt. Stat. Ann. Tit. 12 § 1036 (1996). The plaintiff is barred from recovery if her negligence exceeds that of the defendant. *Id.* The burden is on the defendant to establish the plaintiff's negligence.

The United States has not proved Hamblin was negligent. It is negligent to fail to exercise ordinary care to avoid a patent or obvious danger. *E.g., Wall v. A.N. Deringer, Inc.,* 119 Vt. 36, 38, 117 A.2d 390, 391 (1955) (business invitee who failed to notice a step in front of her and accommodate her stride was contributorily negligent). In this case, however, the Humvee did not present a patent or obvious danger to Hamblin. When Hamblin pulled into the parking lot, Sergeant Armell was arranging himself in his seat and waiting for the wait light to turn off. During this time period, the Humvee's exterior lights were not illuminated and therefore Hamblin had no indication that the vehicle was about to reverse. It was only when Armell started the engine that the vehicle's lights were illuminated. Although the Humvee is a large military vehicle, this fact alone is not sufficient to have posed an obvious danger to Hamblin when she was deciding where to park her car.

Moreover, Hamblin parked in line behind a car at the gas pump. Under the circumstances, it was reasonable for Hamblin to conclude that she could safely park in that spot. "[T]he law does not require an impossibility or a useless precaution." *LeFebvre v. Cent. Vt. Ry. Co.,* 97 Vt. 342, 351, 123 A. 211, 215 (1924). In sum, the evidence does not demonstrate that Hamblin failed to exercise reasonable care while parking her car.

The United States also argues that Hamblin negligently delayed sounding her horn and removing her leg from danger. Under the sudden emergency doctrine, when an individual is confronted with a sudden peril through no fault of her own, she is not bound to exercise the same degree of care as when she has time for reflection. *Stevens v. Nurenburg,* 117 Vt. 525, 533, 97 A.2d 250, 256–57 (1953). The law · recognizes that a reasonable person may fail to use her best judgment, or might not choose the best available method of avoiding danger in an emergency situation. *Id.* The sudden emergency doctrine simply reiterates the principle that the test of negligence must take into account the surrounding circumstances of a particular case. *See Westcom v. Meunier,* 164 Vt. 536, 544, 674 A.2d 1267, 1272 (1996) (Morse, J., dissenting).·

Hamblin was presented with the reversing Humvee through no fault of her own. Her position was undoubtedly one of peril. She sounded her horn as soon as it was evident that the Humvee was not going to stop, but was unable to move her leg in time. The United States' assertion that Hamblin might have acted differently depends too heavily on the clarifying lens of hindsight. The law requires that Hamblin's conduct be evaluated in accordance with the circumstances that existed at the time of the accident. Under these circumstances, Hamblin did not breach her duty to exercise reasonable care.

### B. *Proximate Cause*

Hamblin must also establish that Armell's negligence proximately caused her injuries. To establish proximate causation, the plaintiff must prove by a preponderance of the evidence that the negligent act was a substantial factor in bringing about the alleged injury. *See Tufts v. Wyand,* 148 Vt. 528, 530, 536 A.2d 541, 542 (1987); Restatement (Second) of Torts § 431 (1965).

█ It is undisputed that the July 9, 1999 accident proximately caused the damage to Hamblin's car as well as the leg contusion, swelling and bruising that Hamblin experienced after the accident. Hamblin also alleges that the accident proximately caused injuries to her back and lower extremities, in particular, her left hip, sacrum, buttock, posterior thigh and lateral calf. These symptoms include numbness, tingling and radiating pain. According to Hamblin, these are the symptoms that prevent her from working. Dr. Roomet testified that these radicular symptoms are caused by Hamblin's spinal stenosis. Hamblin does not claim that the July 9, 1999 accident caused her spinal stenosis. Instead, she alleges that the accident aggravated her pre-existing condition.

Hamblin has not proved that the accident aggravated her spinal stenosis and led to the symptoms that prevent her from working. Hamblin relies on Dr. Roomet's opinion that the accident was a competent causal mechanism of her worsened spinal stenosis. A number of factors call into question the accuracy of Dr. Roomet's opinion. Dr. Roomet primarily based his opinion on the temporal proximity between the accident and the onset of Hamblin's symptoms. Yet the chronology between the accident and the onset of Hamblin's symptoms is far from clear. Hamblin reported bilateral hip discomfort a week after the accident. But she did not report the radicular symptoms associated with spinal stenosis until December 7, 1999, five months after the accident. Many factors can intercede during a five-month interval. For example, Hamblin worked over six-hundred hours in the five months between the accident and the onset of her radicular symptoms. Both Dr. Roomet and Dr. Cohen testified that heavy lifting, such as Hamblin performed as an X-ray technologist, can aggravate spinal stenosis. Therefore, the five-month interval between the accident and the onset of Hamblin's radicular symptoms undermines Dr. Roomet's chronological analysis.

In addition, there are a number of factors relevant to proximate cause that Dr. Roomet was unaware of or did not consider when formulating his opinion. (1) Dr. Roomet was unaware that Hamblin had reported radicular pain to her physicians in December, 1997 and January, 1999. He was also unaware of the radicular symptoms in her neck. (2) Dr. Roomet was unaware of Hamblin's foot condition and her knee arthritis. Dr. Roomet acknowledged that both conditions could exacerbate an individual's back problems. (3) Dr. Roomet testified that a slip-and-fall accident could exacerbate spinal stenosis. Yet he was unaware that Hamblin suffered a slip-and-fall accident which required a trip to the emergency room in April, 2000, four months before Hamblin ceased working due to her pain. (4) Dr. Roomet did not consider Hamblin's weight as an exacerbating factor, although he acknowledged that being overweight could also exacerbate back problems. (5) Dr. Roomet failed to consider that Hamblin regularly lifted heavy files and patients at work. He testified that such activity could worsen spinal stenosis.

At trial, Dr. Roomet maintained that none of these factors changed his opinion. Nevertheless, the fact that Dr. Roomet

failed to fully consider a number of viable alternative explanations undermines his conclusion about causation. Any of the above factors, acting alone or together with the others, could have exacerbated Hamblin's spinal stenosis and caused her radicular symptoms. Moreover, Dr. Cohen testified that spinal stenosis tends to worsen over time, even in the absence of a causal mechanism.

There may be multiple proximate causes of an injury. *Tufts*, 148 Vt. at 530, 536 A.2d at 542. Hamblin is not required to establish that the July 9, 1999 accident was the sole cause of her aggravated spinal stenosis. Nevertheless, the burden is on Hamblin to prove that the accident was a substantial factor in bringing about the aggravation of her pre-existing condition. Hamblin has failed to meet this burden.

C. *Damages*

Hamblin has proved by a preponderance of the evidence that Armell was negligent in reversing his Humvee into her parked car. Hamblin has also proved that Armell's negligence proximately caused damage to her car, her calf injury, and pain and suffering. Therefore, Hamblin is entitled to be compensated for these damages. Because Hamblin has not proved that the accident proximately caused her aggravated back condition, she is not entitled to damages arising from that condition.

The Court finds the United States liable for the following: (1) $524.80 in property damages; (2) $2,281.25 in medical expenses; (3) $236 in lost wages; (4) $15,000 in pain and suffering. The United States' total liability equals $18,042.05.